This next case is Slocum v. The Board of Trustees of the State Universities Retirement System. For the appellant, Mr. Klenk. And for the appellee, Mr. Lee. And Mr. Weinstein is not arguing, is that correct? Very good. You may proceed. Good morning, Your Honor. May it please the Court, Paul Klenk for appellants, Professor Patricia Slocum and Patricia Pucchio. This dispute arose out of Professor Pucchio and Slocum's efforts to purchase service credit with the State Universities Retirement System for work they performed as part-time adjunct professors at the College of DuPage before they became full-time professors. They worked as adjuncts in the 1980s, and at that time they were not eligible to participate in SERS because they were not employed on a continuous basis, rather on a quarter-to-quarter basis. When they each became full-time professors in the 1980s, and they became SERS participants at that time, the Pension Act was amended and allowed SERS participants to purchase service credit for prior work performed for a SERS employer when they were, quote, employed at least one-half time for an employer before becoming a SERS participant. The issue here is whether they were employed at least one-half time for various academic quarters in the 1980s. This apparently simple question is complicated because of the changes in formulas used by COD and the actions taken by SERS in COD. So with the Court's indulgence I'll be interweaving facts along with my argument because of that complexity. At the time they performed the work in the 1980s, there is no evidence that COD reported any of that adjunct work to SERS because part-time employees were not eligible because they worked on a quarter-to-quarter basis. In the late 90s, Pupil and Slocum applied with SERS to purchase service credit for that work in the 1990s. When they make the application, SERS asks the employer to provide reports of the work that was performed. At that time, the COD Director of Human Resources was Howard Owens. Owens had devised his own formula to calculate the work percentages of adjunct faculty. That formula was used both for work assignments and for reporting to SERS. Owens' theory was based on various assumptions that full-time professors worked a 40-hour week, that adjuncts did not have student office hours, that they did not work on committees. Under his assumption, adjunct faculty only worked 62.5% as a full-time faculty member assigned to the same credit hour class. His formula then took the credit hours taught by adjuncts and multiplied it by a factor of .625 in order to determine what he felt was their workload. So COD applied that formula to plaintiffs' requests to purchase service credit in the 1990s, and they were eligible to get a couple quarters. In 2006, unrelated to the present dispute, another full-time faculty member filed a grievance alleging that the Owens formula was in violation of college policy 4456. That policy was a straight teaching load, full-time teaching load formula. The FAR Board, Faculty Administrative Review Board, reviewed that grievance and recommended that the Owens formula be discontinued. The college president agreed with that. The college then used a simple teaching load formula. If a full-time professor's load was 15 credit hours, an adjunct was limited to two-thirds of that or 10 hours. The distinction between that teaching load formula and the Owens formula is critical to the court's review of the CERD's decision. The claims panel exceeded its authority and found that the Owens formula was a credible way to The college itself has abandoned the formula, and the plaintiffs presented significant testimony demonstrating the erroneous assumptions Owens used. For example, the claims panel determined the Owens formula was valid because adjuncts were not required to hold office hours. Pukio testified that full-time faculty were required, under the terms of their collective bargaining agreement, to hold student office hours. Pukio and Slocum both testified that although they were not contractually required, both of them were told by their deans that they were expected to meet with students outside of class hours, and they in fact did so. The claims committee exceeded its authority when endorsing the Owens formula and drawing that fine-lined distinction between contractually required and work expectations. After the Owens formula was discredited and discarded by the college, three other employees, Joyce Abel, Nancy Conran, Sue Skensky, applied to CSRS to purchase service credit for adjunct work they performed in the 1980s. CSRS approved those applications. When Plaintiffs Pukio and Slocum heard of this, they asked the new HR director, Greg Juice, how their adjunct work from the 1980s would be reported to CSRS. His assistant respondent said she would use the teaching load formula and showed them how she would report it. They applied to CSRS. CSRS asked COD to report. COD reported exactly as HR said that they would report. CSRS Director of Member Services, Angela Lee, then initiated a review of that application and asked why COD was reporting their workload differently in May 2007 than they had in the 1990s. COD then revised in September 2007 their report to CSRS and again used the discarded Owens formula to calculate work percentage. This appeal to CSRS followed. A hearing was then conducted before the Claims Committee in 2008, which resulted in a remand back to the CSRS staff to find evidence of what formula COD used in the 1980s, quote, when reporting to CSRS, which of its employees performed at least half-time work for the CSRS employee to the new interim COD HR director since Greg Jouse had died. The new COD HR director, Sue Senske, responded in a sketchy email that's outlined in full in our brief and in the record. When CSRS disclosed this email to plaintiffs, plaintiffs immediately pointed out that Senske had no foundation, established no in the 1980s, and in fact Senske herself was one of the beneficiaries of purchasing new service credit under the new formula. CSRS nevertheless continued to deny plaintiffs' requests and another hearing was held. That is the entirety of the new evidence that was gathered. Senske did not testify. CSRS issued its decision, in this case relying nearly entirely on that Senske email to conclude that the Owens formula was used in the 1980s to determine workload. Plaintiffs are seeking this administrative review because CSRS relied on this informal, unsupported email that lacked any legal foundation. CSRS ignored the competent, unrebutted testimony and evidence provided by plaintiffs that CSRS fails to address or give weight to in its decision. First, the college policy 4456. That was in existence before the 1980s and it limited part-time assignments to two-thirds of a normal teaching load. Teaching load is strictly a determination of credit hours. Second, Slocum and Puccio testified they were repeatedly told by their deans that their adjunct assignments were limited to this policy of two-thirds of a full-time load. Since both of their departments' full-time loads were 15 hours, they were limited to no more than 10 hours during a particular quarter. Third, adjuncts were issued assignment sheets for each quarter. These assignment sheets listed the courses being taught, the number of credit hours the adjuncts were teaching, and the percentage of time they were employed. These percentages were entirely consistent with the teaching load formula contained in policy 4456. If an adjunct is assigned a five-hour credit course, it lists on the assignment sheet that they had a 33 percent of a full-time equivalent. Thus, the only contemporaneous documents that we have from the 1980s and the only testimony offered at the hearing concerning workload determinations made by the college in the 1980s completely supports the plaintiffs. All the credible evidence shows the teaching load formula was used by the college in the 80s to determine adjunct workload. There is no evidence beyond Senske's email that the Owens formula was used in the 80s. While both the Administrative Hearing Act permit the admissibility of hearsay evidence, it must be of, quote, "...type commonly relied upon by a reasonably prudent man in the conduct of their affairs." Similar evidentiary issue was confronted in Flex versus the Board of Review of the Department of Labor. Flex testified in an unemployment hearing that she told her supervisor that she needed time off from work to arrange for childcare. Her second-level supervisor testified and offered hearsay testimony that she told her immediate supervisor that she was not returning to work. The Department of Labor credited the hearsay testimony and denied her benefits. The court reversed on review. The court held that it must look at all the evidence and that it cannot credit hearsay over the plaintiff's contrary, competent testimony. That is just what we're asking for here. The clear weight of the evidence supports the plaintiffs. The evidence of an informal email with no foundation offered for its knowledge or reliability cannot be given greater weight than the testimony of the plaintiffs, the unrefuted application of 4456, and the assignment sheets which show contemporaneous accounting of the workload in the 80s. No reasonably prudent person would rely on an unsupported email exchange in the conduct of important affairs, much less an entity that has a fiduciary duty to the individuals affected by the decision. Plaintiffs immediately and repeatedly put SIRS on notice that the Senske email was devoid of foundation or any substantiated knowledge, yet SIRS made no efforts to substantiate the information in her email. Who moved to admit the Senske, their email, before the hearing officer? In the course of the hearing, as the hearing was going on as we were moving to the next witness, I realized that the evidence that had been presented to the panel had not been moved to admission. So I moved to admit the entire evidence that had been produced. I advised the hearing officer that we were saying that the Senske email was unsubstantiated and should not be relied on. But it was my movement of the entire packet of evidence. SIRS argues that they are bound by what the employer reports to them. They are relying on statutory language found in 15-134.1 of the Code Provision that is issued here. SIRS asserts that if COD reports plaintiff worked less than half-time, SIRS must accept that report. That position is not in accord with the statute. 15-113.1 allows SIRS participants to purchase service credit for prior work performed when they were employed at least one half-time before becoming a SIRS participant. The statute does not say SIRS must only rely on what is reported by the employer. SIRS must look at all the evidence provided to them and make a determination of when an employee was employed at least one half-time. The evidence according to the employer's report, it explicitly states it's deferring to the Senske email. Again, Policy 4456, the deans, and the assignment sheets all are contrary to that. When COD initially reported plaintiff's workload in May 2007, COD utilized the teaching load formula. It was only after SIRS intervened that COD reverted back to the discredited, discontinued Owens formula in reporting to SIRS. Let me add one more thing to that. The lens that the court must use when interpreting pension statutes, and that was set forth by the Supreme Court in Johnson v. the Retirement Board of the United States, must be liberally construed in favor of the rights of the pensioner. That's the lens the court should use. And finally, I want to briefly address the equal protection claims that the plaintiffs raised. From the very first, they asserted their claim to SIRS. Plaintiffs asked that they be This claim for equal treatment is rooted in the U.S. and Illinois constitutions. To treat similarly situated individuals differently, the state must provide a rational basis for that different treatment. Pucchio and Slotham testified without challenge that Senske, Abel, and Conrad performed similar adjunct work in the services. Angela Lee testified that other individuals purchased service credit under the teaching load formula, presumably referring to those three individuals. SIRS has offered no rational basis why three COD employees were allowed to purchase additional service credit using the teaching load formula to benefit from their work. Any questions from the panel? Could pension benefits be different for people who did exactly the same work and had exactly the same teaching load, depending on whether they worked at SIRS or not? That said, it's up to the employer to make that determination. And it doesn't make logical sense. And it's one of the reasons that the FARB recommended that they go back to the teaching load formula, because that group studied what other colleges were doing and said, that's the consensus of what colleges are doing. They're using that teaching load formula. We should too. And COD agreed with that. The president agreed with that. Do you have any knowledge as to whether the Owens formula is used or some variant of that taking into account office hours and committee work? I do not know. I think it was, I believe it was strictly a creation of Howard Owens, that it was his belief. And then what it resulted in, the result of that was, because it was discounted, adjuncts could work more hours, because their workload was being discounted. So the college could hire more adjuncts at a cheaper rate as well. And that's a reason for the full-time faculty challenge. I'm shocked that they would try to make the adjuncts work longer hours. It's shocking. Okay. Thank you. And I reserve any additional time for rebuttal. Thank you. Mr. Lee? How do we get around this equal protection claim? Oh. The equal protection claim, I believe, was not properly, do I have to introduce myself first? We know who you are. Okay. We believe it was not properly brought, because the facts alleged do not go with the kind of specificity that is required to bring an equal So they allege that they worked on a part-time basis in the 1980s, the same decade. What they don't allege is at what percent times they worked. The statute requires that the percent time be at least 50% in order to be able to purchase the service. We have no idea what percentages they worked. If they worked at a percentage, under either formula, would be over 50%, then would it make any difference whether they used the Owens formula? So you don't believe that your opponent's assertion that Professor Senske worked the same hours during the same time period, Senske got a pension, and the petitioners here don't? The record does not indicate that. There was no testimony as to the specific hours, class loads, teaching hours, contact hours, all of this. Which basically goes to show that the opposing counsel spent a lot of his time going through the minutiae of how the College of DuPage came up with this part-time percentage reporting. And that is exactly the kind of minutiae that the General Assembly did not want the Board of SERPs to get into when they passed 15134.1 sub B. Maybe they should have. Well, it impacts the pension system. So an individual college has the capacity to affect the liabilities of the state and the benefits to state workers based on some person creating this strange formula. True? Yes, that is exactly true. Under that provision, because this is an automatic deferment to what the employer reports, the Board's hands are tied. They have no discretion in determining what percentage a person worked at. That's entirely in the hands of the employer. And therefore, we believe that there is no equal protection violation when it's really up to the college to report and drive the analysis here. The Board did go into some detail about the significance of the Owens formula, the Susansky formula, because they were, like you, Justice Connect, they were grappling with, okay, what is going on here? But at the final analysis, the statute basically says, hey, you have to rely on what the employer says. There is no discretion to look behind that representation. And that's exactly what happened in this case. The employer reported a set of numbers in the late 90s. They came up with a new set of numbers in May 2007. The SURS staff basically asked the College of DuPage, okay, why is there a contradiction? And the College of DuPage said, basically, whoops. And they, again, revised those numbers to reflect the old ones. If you look at 15134.1 sub B, the staff didn't do anything wrong. They just basically relied on the latest representation of the college. And they gave the college a reasonable question. Why do we have two sets of numbers here? I mean, I don't think that amounts to an equal protection violation just to ask what's going on. And giving the opportunity for the college to either say, no, those are actually the right numbers. Or, no, we made a mistake. Let us fix it. And it is the latter circumstance that happened in this case. I'd just like to briefly address the manifest weight of the evidence standard because I think that was not fully fleshed out by opposing counsel. We believe that is the standard that must apply here because it is a factual issue whether the plaintiffs worked at part-time or full-time or whatever time. That's not a legal issue. None of the statutes are in dispute. The application of the prior service purchase statute is very mechanical. It's just, you know, A plus B equals C. That's what's going on here. A being the facts, B being the law, C is the outcome. C is not under dispute. They're not disputing that, yes, if they were at the college reported at times under 50% that this would be the result, or they produced a percent times over 50% that another result would come out. None of that is under dispute. It's actually A, the factual component that is at dispute. How did the board determine that these individuals worked at less than 50% time and thereby making them ineligible to purchase service? And again, the board basically relied on pieces of the evidence in the record which are actually multiple concerning what the college intended to report. There are the two sets of reports of the college. I think that opens and shuts the case for us. But then in addition to that, Julie Boyce, the College of DuPage Human Resources Department, sent an email that the college was indeed, that they made a mistake, and they're reverting back to the so-called Owens formula way of reporting things. And third, there's an email from the former college president, Sunil Chand, speaking as to the applicability of this new regime by saying that these new changes are going to be taking place on a prospective basis only. What he says exactly is that the practice of discounting the percent time should not be continued effective at the date of this memo or any time reporting that occurs on or after this date only. So the phrase should not be continued acknowledges that the Owens formula was continual past practice up until that point. And yet that email never condemns that practice or directs that any retroactive action be taken. Basically, the email simply says that going forward they're to report things in a different way. So we think that plaintiffs are, in essence, barking up the wrong tree. If there's any equal protection violation, if there's anything wrong with the way that the figures are reported, the college is the one who should be making the corrections here. They're the ones who are ultimately responsible for the part-time percentage reporting. And the board is just simply following the law in applying those figures and then coming to, in a very mathematically strict way, to the result. So I'd like to entertain any questions that you may have. There don't appear to be any. Thank you. Mr. Craig? Thank you. I do want to address one of the counsel's statements concerning the equal protection. And he said, we have no idea what percent they've worked, meaning the other three individuals. Well, yes, they do exactly have that information because COD sent it to CSRS. CSRS then accepted that information, put it in their files, and awarded service credit on that. Our argument was not a surprise to CSRS. At the very first statement of claims that claimants have to file before a hearing is held, they're required to set forth all of their arguments. And we set forth that other three individuals, we named the individuals, were treated differently. So all of that information CSRS had to make any indication as to why they were differently situated than plaintiffs, and they offered no evidence as to why they were given, essentially. Regarding the Chand email, I addressed that in my rebuttal brief. Well, what did you know about those other three people? The evidence that's introduced at hearing is, I believe it was Pukio testified that, I have a question for you, did those individuals work part-time in the 1980s just as you did? Yes. Is it your understanding that they purchased credit hours reported by COD under this corrected formula? Yes. So that's what my clients offered, that it was their understanding that these three individuals who they had worked with through the 80s were similarly situated to them, and that's in fact why they applied to CSRS for additional benefits. They heard that these other individuals got them, so they applied as well. So that sounds like, I've got post-conviction, which you may not know anything about, the gist of the claim. I mean, it said, hey, these people, and you're the one, and impliedly, you're saying the other side, you're the ones that have the records which show whether or not that's exactly true and that's how it was reported by the college. Yes, we believe we've made a prima facie case, is a term I would use. So, your prima facie case is not rebutted, your view would be. Yes. But if I'm the board, do I want to make an equal protection decision based upon just that? Because it is not one of those three people saying, yeah, I purchased the credits, it's somebody else saying, yeah, they worked with me and they purchased the credits. In fact, one of the individuals provided evidence contrary to us saying the formula was the Owens formula that was used in the 80s, though she benefited by, apparently, according to our understanding, under the teaching vote formula. Under the teaching vote formula. Why didn't somebody say we need to know more? Well, I can only go on what's in the record. Right, right. And there's no other record evidence. Would there have been a mechanism for that to occur? I'm assuming there would have been. What would it be? Subpoenaing them to testify? What do you mean the board saying? Well, the board, again, the board has that information. Angela Lee, it's hard to say whether she testified, but there was an interchange in the course of the hearing where Angela Lee said, yes, the other individuals purchased time, or other individuals purchased time under the teaching vote formula. So, she's the director of those member services, would have those records, and indicated there was some exchange. But if it was under the teaching vote formula, maybe they were teaching three-quarter time and they would have qualified under either formula. That's what you don't know. I do not know that, correct. And do they know that? They being? They being the board. But how can the board know that if all they're going by is what's reported to them that says this person qualifies? So, they pay in. Am I misunderstanding that? No, I'm trying to, again, picture in my mind exactly how that report was made to CSRS from COD. This person worked more than half time. Well, it was in percentages. And the text doesn't say, we calculated this at this moment based upon one formula or the other. It just says this person worked this percentage. Correct, it did not do that. But the logic is they only apply for those benefits after the teaching vote formula was changed. They didn't apply for it before that. It was after it changed, almost immediately afterwards, it was a direct. That's it. No other statements. Anything else? Thank you. Thank you. We'll take this matter under advisement and stand in recess until we're applied.